# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-11173

United States Court of Appeals
Fifth Circuit

**FILED**
December 4, 2018

Lyle W. Cayce
Clerk

LINDA GAIL WINSTON,

> Plaintiff - Appellant

v.

NANCY A. BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY,

> Defendant - Appellee

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:16-CV-419

Before JONES, CLEMENT, and SOUTHWICK, Circuit Judges.

EDITH H. JONES, Circuit Judge:*

Appellant Linda Winston appeals the final decision of the Social Security Commissioner denying her claim for disability and disability insurance benefits under Title II of the Social Security Act. After carefully reviewing the record, we AFFIRM the Commissioner's decision.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-11173

## BACKGROUND

According to her application for Social Security disability and disability insurance ("DI") benefits, Winston suffers from diabetes, neuropathy, high blood pressure, arthritis, tendonitis, cataracts, and retinopathy. She also struggles with obesity, which exacerbates her health problems. Winston first applied for disability and DI benefits on November 16, 2012, alleging that her disability began on May 29, 2008. After her claim was denied, she requested a hearing before an administrative law judge ("ALJ") and amended her alleged onset date from May 29, 2008 to February 22, 2012. Thus, to establish eligibility, Winston was required to demonstrate the existence of a qualifying disability between the dates of February 22, 2012 (the alleged onset date) and December 31, 2013 (the date her insurance eligibility expired).

Winston appeared and testified before an ALJ at her requested hearing on May 5, 2014. A vocational expert also testified. At the time of the hearing, Winston was 48 years old, weighed approximately 375 pounds, was 5' 5" tall, and had a high school education. Her prior employment included working as a residential director at Edu Care Community Living (i.e., as a program aide) and as a psychiatric aide. At the hearing, Winston described her health problems, including daily "[p]ain in [her] legs and feet and arms," lower back trouble, poor eyesight, and medication-induced dizziness and lightheadedness. As a result of these symptoms, Winston testified: she can only stand in one place for "about ten minutes" before needing to sit; walk for 15-20 minutes before needing to stop; sit for 30 minutes before needing to stand because of pain in her knees; and if she starts to walk too soon after standing, she falls. Winston also stated that she uses a cane to get around her house and a walker if going out where she will have to walk longer distances; that she does basic household tasks like folding laundry and grocery shopping; that in an eight-

2

hour day, she probably spends five hours sitting and two hours on her feet; and that she can lift ten pounds.

The vocational expert testified after Winston. When asked to assume a hypothetical individual of Winston's "age, education and work experience" who can perform work at a sedentary level; lift up to ten pounds occasionally; stand and/or walk for a total of two hours and sit for a total of six hours in an eight-hour day; never climb ladders, ropes, or scaffolds but occasionally climb ramps and stairs; occasionally balance, stoop, crouch, kneel, or crawl; occasionally lift overhead; and never be exposed to unprotected heights or hazardous moving machinery, the expert stated that work exists in the regional and national economy for such an individual. The vocational expert also testified that requiring a cane for ambulation would not affect the availability of work for such an individual. However, when asked if this same hypothetical individual could find work in the economy if "allowed to sit or stand alternatively provided they can maintain either position for 30 minutes, and if they're off task, they would be off task less than ten percent," the vocational expert testified that there would be far fewer positions for that individual. Such an individual could still work as an order clerk, dowel inspector, and surveillance system monitor; however, requiring the use of a cane would eliminate these remaining positions.

On September 22, 2014, the ALJ denied Winston's claim for disability and DI benefits, concluding that Winston was not disabled during the relevant period because she had "the residual functional capacity to perform sedentary work." In so concluding, the ALJ evaluated Winston's alleged symptoms against the medical evidence in the record and found her credibility lacking. In her analysis of the medical evidence, the ALJ explicitly discussed the medical opinions of three physicians: two state agency medical consultants who

No. 17-11173

opined that Winston "can perform sedentary exertional work with a few postural limitations" and Winston's treating physician[1] who opined that Winston has a permanent disability. The ALJ assigned "limited weight" to all three opinions. The ALJ also implicitly discussed the report of a fourth physician, Dr. Kelley Davis, who examined Winston at the agency's request, by referencing select observations from Dr. Davis's evaluation throughout her decision. However, the ALJ did not indicate the weight given to Dr. Davis's evaluation nor mention Dr. Davis by name, and did not explain how she decided which observations from Dr. Davis's report to credit, as some appeared favorable to Winston, counseling against denial.

After her claim was denied, Winston requested review from the Appeals Council, but the Council denied her request on December 16, 2015, which made the ALJ's decision the final decision of the Commissioner. On February 15, 2016, Winston filed a complaint in federal district court to contest the Commissioner's decision. The parties consented to proceedings before a United States Magistrate Judge. On March 31, 2017, following briefing, the magistrate judge issued a Memorandum Opinion and Order, affirming the Commissioner's decision. The same judge denied Winston's Rule 59(e) motion for reconsideration in a written order on August 14, 2017. Winston timely appealed.

**STANDARD OF REVIEW**

"On judicial review, the ALJ's determination that a claimant is not disabled will be upheld, if the findings of fact upon which it is based are supported by substantial evidence on the record as a whole, and if it was reached through the application of proper legal standards." *Loza v. Apfel*,

---

[1] The ALJ referred to this individual as "a physician's assistant," a characterization to which Winston fervently objects.

219 F.3d 378, 389 (5th Cir. 2000). Substantial evidence exists if the record "yields such evidence as would allow a reasonable mind to accept the conclusions reached by the ALJ." *Id.* at 393. "[I]t must be more than a scintilla, but it need not be a preponderance." *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992). With substantial evidence review, this court "may not reweigh the evidence, try the issues *de novo*, or substitute our judgment for that of the [Commissioner]." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). "A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision." *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000). By contrast, this court's review for whether the Commissioner applied the proper legal standard is a bit more exacting. For instance, ALJs generally cannot reject a medical opinion without providing an explanation for that rejection, even if good reasons exist for disregarding the opinion. *Kneeland v. Berryhill*, 850 F.3d 749, 759–61 (5th Cir. 2017). Failure to explain the rejection of a medical opinion justifies a remand. *Id.* at 762.

## DISCUSSION

To be entitled to Social Security disability and DI benefits, an individual must show that she is "disabled" within the meaning of the Social Security Act. *Leggett v. Chater*, 67 F.3d 558, 563–64 (5th Cir. 1995). "Disability is defined as an 'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment' lasting at least twelve months." *Kneeland*, 850 F.3d at 753 (quoting 42 U.S.C. § 423). To determine whether a claimant is disabled, the Commissioner adopts "a sequential, five-step approach," seeking to ascertain:

"(1) whether the claimant is presently performing substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents the claimant from doing past relevant work; and

No. 17-11173

(5) whether the impairment prevents the claimant from performing any other substantial gainful activity."

*Morgan v. Colvin*, 803 F.3d 773, 776 (5th Cir. 2015) (citing and paraphrasing 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)). "[I]f the Commissioner determines at a prior step that the applicant is or is not disabled, the evaluation process stops . . . ." *Id.* "The burden of proof is on the claimant at the first four steps," but it "shifts to the Commissioner at the fifth step to establish the existence of other available substantial gainful employment that a claimant can perform." *Kneeland*, 850 F.3d at 753–54 (quoting *Morgan*, 803 F.3d at 776 n.1). "If the Commissioner identifies such employment, the burden shifts back to the claimant to prove that she could not perform the alternative work identified." *Id.* at 754 (quoting *Morgan*, 803 F.3d at 776 n.1).

Between the third and fourth steps, the Commissioner must decide the claimant's "residual functional capacity" ("RFC"), which is defined as "the most the claimant can still do despite his [or her] physical and mental limitations . . . based on all relevant evidence in the claimant's record." *Id.* (alteration in original) (internal quotation marks and citations omitted). The Commissioner must consider all medical opinions contained in the record when making the RFC determination. *Id.* at 759 (citing 20 C.F.R. § 404.1527(b)). When medical opinions in the record conflict, the Commissioner must "weigh the relevant evidence" and explain her reasons for rejecting one medical opinion as less credible than another. *Id.* at 759–60 (internal quotation marks and citation omitted). Otherwise, the Commissioner commits legal error and any resulting RFC will not be supported by substantial evidence. *Id.* at 759 ("Given that Dr. Bernauer's opinion is a medical opinion, the ALJ legally erred by rejecting it without explanation, which resulted in an RFC not based on substantial evidence.").

6

No. 17-11173

On appeal, Winston challenges the Commissioner's decision that she is not disabled because she can do sedentary work. Specifically, "Winston contends that she needs at least two accommodations that the RFC finding denies her: (1) The freedom (at need) to use hand-held support (such as a cane) to stand (and occasionally to walk), and (2) the option to stand after about 30 minutes of sitting." Absent such accommodations, if faced with the strain of working full-time, Winston claims she will fall at an increasing rate. Moreover, because the vocational expert testified that there are no jobs in the economy for a hypothetical individual of her age, education, and work experience who suffers from her symptoms and requires both requested accommodations, the Commissioner's failure to grant these accommodations is "of potentially dispositive significance." Winston urges this court to reverse the Commissioner's decision on three grounds: (1) the ALJ relied on an outlier figure in calculating Winston's obesity and assessing its effects; (2) the ALJ selectively relied on only unfavorable findings from Dr. Davis's evaluation and failed to assign Dr. Davis's evaluation a weight; and (3) the ALJ did not evaluate Winston's fall risk.

## I. Evaluation of Winston's Obesity

In her written decision denying benefits, the ALJ found that Winston "is 5 feet, 5 inches tall and weighs 333 pounds" and "is obese with a body mass index (BMI) of 55.4." According to Winston, this 333 lbs. value was taken directly from Dr. Davis's medical evaluation and is Winston's lowest recorded weight in the relevant period between February 22, 2012 and December 31, 2013.[2] In fact, this recorded weight of 333 lbs. is "lower than all others by between 44 and 67 pounds." Winston claims this discrepancy—combined with Dr. Davis's statement that Winston was "at her highest weight" at 333 lbs.—

---

[2] The Commissioner does not contest this characterization.

7

should have alerted the ALJ that the value was unreliable. In any case, a 333 lbs. value is a "distant outlier" that cannot suffice as substantial evidence, especially in view of the conflicting, significantly higher weights recorded both before and after Winston's evaluation with Dr. Davis—values the ALJ failed to discuss.

Winston further argues that the ALJ's reliance on this aberrant value was prejudicial, citing the ALJ's observations that Winston's obesity "impairs [her] ability to perform work-related activity" and "may have exacerbated her other physical impairments," and that her doctors "discussed the importance of exercise and weight loss in order to improve her pain symptoms." According to Winston, "[t]here is a direct mathematical relationship between the number of excess pounds an obese person carries and the force each knee joint is subjected to during walking." Thus, by underestimating Winston's weight by 44 to 67 pounds, the ALJ simultaneously underestimated the severity of Winston's pain and seriousness of her fall risk. Winston contends that the ALJ's assessment of Winston's credibility was also damaged by this error. In her decision, the ALJ was troubled that Winston "complained that her pain level appears to be increasing" while "the objective findings have not changed" and "[h]er condition does not show deterioration." Winston argues that if the ALJ had considered her range of weights, she would have realized that Winston's weight increased from 2009 to 2013, supporting a claim of increased pain. Claiming there is a "realistic possibility that the ALJ would have reached a different result" absent this error, Winston requests a remand to the ALJ. *See Prudhomme v. Colvin*, 605 F. App'x 250, 254 (5th Cir. 2015).

In response, the Commissioner does not dispute that the ALJ relied on an aberrant weight value nor that Winston's weight was relevant to the ALJ's analysis. Instead, the Commissioner argues that "[t]he ALJ properly found

that during the relevant period, Winston's obesity did not preclude her ability to perform a range of sedentary work." Put simply, "a particular weight does not correlate to a particular work-related limitation" and "[t]he ALJ properly focuse[d] on functional limitations, not diagnoses or BMI scores." The Commissioner also suggests that the ALJ considered Winston's full weight range, even though she only noted the 333-lbs. value. For instance, "[t]he ALJ listened to Winston's testimony that she weighed 375 pounds at the time of the hearing (more than four months after the relevant period), but her weight had fluctuated to as low as 325 pounds" within the past five years.[3] The ALJ also observed that Winston's weight had fluctuated during the relevant period in her decision. Finally, the Commissioner points out that "the ALJ still found Winston had severe 'morbid obesity,'" implying that any error from the 333-lbs. value was harmless.

This court agrees with the Commissioner. Although the ALJ's reliance on Winston's 333 lbs. weigh-in may not yield *the most* accurate indication of the strain on Winston's body, the ALJ's decision that Winston can perform sedentary work was not tied to a specific weight. There is substantial evidence to support the ALJ's RFC determination, rendering any error from the 333-lbs. value harmless. *See Harris*, 209 F.3d at 417. For instance, before discussing Winston's obesity, the ALJ analyzed Winston's other ailments, such as her diabetes mellitus, neuropathy, vision impairments, pain, and hypertension. It was in this context that the ALJ initially expressed skepticism towards Winston's credibility, noting that her medical examination results were repeatedly "within normal limits" and "stable." It was also in this context that the ALJ stated that "[t]he claimant's impairments appeared to have improved."

---

[3] Dr. Davis's evaluation also noted that Winston's obesity is "chronic and worsening," arguably alerting the ALJ that the 333-lbs. value was not a fixed weight.

No. 17-11173

As the decision progressed, the ALJ recited additional reasons to doubt Winston's credibility—again, none of which were connected to Winston's weight. The ALJ observed that "[the claimant] alleged chronic pain but her medications are mostly for diabetes, hypertension, gout, etc." and that she "alleges significant limitations in her activities of daily living, yet the overall evidence indicates she can still perform various activities." The ALJ cited findings from medical reports where Winston was noted "to have no musculoskeletal tenderness," to have "walk[ed] without assistance," to have "denied dizziness or headaches," and to have "normal" vision, muscle strength, and grip. The ALJ further remarked that "the claimant appeared for the hearing with no cane, no walker, no assistive device, and appeared to ambulate well."

Significantly, none of these medical examination results or observations about Winston's functional capacity would change if the ALJ substituted the 333-lbs. weight value for a higher one, because none of these bases for skepticism depend on a numeric value. Instead, they capture Winston's health and capabilities at the moment the examination or observation was made, regardless of her exact weight. In this way, the ALJ appropriately conducted "an individualized assessment of the impact of obesity on an individual's functioning" rather than focusing on the weight itself. *See* Titles II & XVI: Evaluation of Obesity, SSR 02-1P, 2002 WL 34686281, at *4 (S.S.A. Sept. 12, 2002). In addition, although there is language in the decision that recognizes a correlation between obesity and pain, the ALJ did not clearly rely on that correlation in discrediting Winston's testimony or concluding that Winston can perform sedentary work. *See Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) ("The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision . . . ."). Absent evidence that the ALJ mistakenly believed Winston's

10

weight was stable at 333 lbs. and that she relied on that belief in reaching her decision, this court declines to reverse.

## II.    Dr. Davis's Medical Evaluation

Throughout her decision, the ALJ incorporated findings from Dr. Davis's medical evaluation conducted on March 13, 2013, citing statements to support her conclusion that Winston is not disabled.  However, the ALJ did not discuss other statements in the evaluation that were favorable to Winston's claims. On appeal, Winston contends that the ALJ's treatment of Dr. Davis's evaluation violates legal standards governing the use of medical opinions in RFC determinations because: (1) ALJs are required to give an explanation for rejecting a medical opinion, especially if it conflicts with the RFC determination, but the ALJ failed to do so; and (2) federal regulations require ALJs to assign each medical opinion a weight and explain the reasons for that weight, but the ALJ did not weigh Dr. Davis's evaluation, making it difficult for this court to meaningfully assess the ALJ decision.[4] *Cf. Kneeland*, 850 F.3d at 759; Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P, 1996 WL 374184, at *7 (S.S.A. July 2, 1996); 20 C.F.R. § 404.1527(c)(2).

For both alleged errors, the threshold question is whether Dr. Davis's evaluation is a "medical opinion" within the meaning of the Social Security Act—because the legal standards allegedly violated apply to medical opinions. Under the Social Security Act, a "medical opinion" is a "statement" from a physician, psychologist, or other acceptable medical source that "reflect[s] judgments about the nature and severity of [the claimant's] impairment(s),

---

[4] After Winston's claim was filed, the Social Security Administration changed its regulations so that ALJs are no longer required to assign each medical opinion a weight: "For claims filed on or after March 27, 2017 . . . [w]e will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . ."  20 C.F.R. § 404.1520c(a).

including [her] symptoms, diagnosis and prognosis, what [she] can still do despite impairment(s), and [her] physical or mental restrictions." *Kneeland*, 850 F.3d at 759 (quoting 20 C.F.R. § 404.1527(a)(2)).  According to Winston, Dr. Davis's evaluation is a medical opinion because it includes "statements . . . that reflect [Dr. Davis's] judgments about . . . what [Winston] can still do despite [her] impairment(s), and [her] physical restrictions."   In support, Winston quotes statements from Dr. Davis's evaluation, such as that "[Winston] had great difficulty standing and used the furniture and wall for support," that "[s]he moved with slow motions," and that she needed "assistance to move her right LE [lower extremity] while in seated position." In contrast, the Commissioner calls Dr. Davis's evaluation "a physical examination" that "diagnosed several physical impairments" but gave no "opinion" on Winston's capabilities.  The Commissioner casts Winston's quoted examples as "mer[e] comments describing Winston's physical demeanor at the appointment."

Upon reviewing Dr. Davis's medical evaluation, this court concurs with the Commissioner.  Dr. Davis's evaluation makes "judgments about the nature and severity" of Winston's "symptoms, diagnosis and prognosis," but it does not opine on "what [Winston] can still do despite [her] impairment(s), and [her] physical or mental restrictions."  *Cf.* 20 C.F.R. § 404.1527(a)(2).  Rather, the evaluation simply outlines Dr. Davis's diagnoses and observations, leaving other personnel to draw conclusions about the implications for Winston's RFC. In this way, Dr. Davis's evaluation is distinguishable from the medical opinion in *Kneeland.  See* 850 F.3d at 759 ("Dr. Bernauer's opinion meets this definition as he examined Kneeland, noted observations from that examination, *and opined on her work limitations*.") (emphasis added).  Furthermore, the ALJ's reliance on Dr. Davis's evaluation—even exclusively at times—does not

convert it into a medical opinion for purposes of the Social Security Act.[5]  The ALJ was entitled to rely on the evaluation as a source of evidence, even if it was not technically a medical opinion.  *See Loza*, 219 F.3d at 393 ("Written reports by physicians who have examined the claimant setting forth medical data are admissible in evidence in a disability hearing . . . .").

Because the definition of a "medical opinion" requires both an evaluation of symptoms and an expression of judgment regarding a claimant's capabilities and restrictions, Dr. Davis's report is not a medical opinion within the meaning of the Social Security Act.  *See* 20 C.F.R. § 404.1527(a)(2) (using "and" to connect the definitional phrases).  Therefore, the ALJ did not violate any legal standards specific to medical opinions when she assessed and incorporated the observations noted in Dr. Davis's evaluation.

## III.    Evaluation of Winston's Fall Risk

Finally, Winston argues that the ALJ erred by failing to assess her risk of falling.  Because susceptibility to falling is arguably incompatible with her RFC determination, Winston claims the ALJ had a duty to explain how her history of falling factored into the decision.  *Cf.* Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P, 1996 WL 374184, at *7 (S.S.A. July 2, 1996) ("The adjudicator must [] explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.").

Throughout her briefing, Winston asserts that there is "overwhelming evidence from treating doctors that she is a 'fall risk,'" and that her risk of falling will only increase with the added strain of working full-time.  Winston notes that several observations in Dr. Davis's evaluation—such as her

---

[5] The ALJ cited Dr. Davis's evaluation for the results of a vision test administered to Winston and for the 333-lbs. weigh-in value.

statement that Winston "had great difficulty standing and used the furniture and wall for support" and that the sensory nerves in her feet are impaired—lend credence to her fear of falling. However, in her decision, the ALJ never explicitly discussed Winston's history of falls or her need for fall precautions. Winston argues that when there is "conflicting medical evidence" in a disability case, "[t]he trier of fact has the duty to resolve that conflict." *See Richardson v. Perales*, 402 U.S. 389, 399, 91 S. Ct. 1420, 1426 (1971). Because Winston's fall risk is arguably at odds with her RFC determination and the ALJ failed to recognize that tension, Winston claims the Commissioner's decision is not supported by substantial evidence. In any case, Winston claims the ALJ's failure to address falling thwarts meaningful judicial review, and she urges this court to remand "for clarification or further fact-finding."

The Commissioner seeks to discredit the medical notations indicating Winston's frequent falls as "simply a recitation of Winston's complaints" to her physician. The Commissioner also points out that several of the record citations provided by Winston are from 2014, which is outside the relevant timeframe and thus irrelevant for purposes of determining Winston's RFC. "Otherwise," the Commissioner notes, "the record reveals that Winston did not use assistive devices at any of her appointments," once more urging this court to affirm in light of the full record.

This court concurs with the Commissioner. Although the ALJ did not expressly use the term "falling" in her RFC assessment, the ALJ clearly factored Winston's susceptibility to falling into her decision. For instance, the ALJ noted that Winston has "difficulty standing" and "report[s] pain symptoms in the back and legs and has numbness and tingling in the feet," all of which contribute to a risk of falling. However, the ALJ did not find these observations determinative given Winston's demonstrated ability to "ambulate well"

without a cane, walker, or other assistive device; her "fairly normal musculoskeletal examination[s]"; her good muscle strength; and her consistent denials of "dizziness/lightheadedness, drowsiness, or complaints of medication side effects" during clinic visits. In view of "the record, read as a whole," it cannot be said that the ALJ failed to explain material inconsistencies or that "a reasonable mind [could not] accept the conclusions reached by the ALJ." *See Loza*, 219 F.3d at 393. Therefore, the RFC determination was supported by substantial evidence.

## CONCLUSION

For the foregoing reasons, we AFFIRM the Commissioner's decision.